Filed 1/31/25  P. v. Quiroz CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALEJANDRO CESAR QUIROZ,<br><br>    Defendant and Appellant. | B331767<br><br>Los Angeles County<br>Super. Ct. No. BA481286 |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Karla D. Kerlin, Judge.  Sentence stayed in part and judgment affirmed in all other respects.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

Defendant Alejandro Cesar Quiroz was convicted of sexual penetration by force (two counts), assault with intent to commit a felony, and false imprisonment by violence.  Two of the three aggravating factors charged were found true.  The trial court sentenced defendant to 14 years in prison.

Defendant claims the trial court erred in refusing his proposed instruction on third party culpability.  He also asserts prosecutorial misconduct; error in imposing consecutive sentences on the first three counts; the trial court's failure to exercise its discretion properly in imposing the middle term on three of the counts; and a violation of the Penal Code section 654 ban on multiple punishments for the same act.  (Further undesignated statutory references are to the Penal Code.)

We agree that the sentence for false imprisonment by violence should have been stayed, but otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

### 1.    The Crimes

Late in the evening of September 14, 2019, Veronica V., then 19 years old, met defendant at some stairs near her home and near Montecito Heights Community Park.  Defendant had texted Veronica in response to a post of Veronica's on social media, and asked her to meet.  Veronica was acquainted with defendant, and knew him by his gang monikers as "Lunitik" and also as "Cray."  They had seen each other at social gatherings with other friends over the past year.  Defendant wanted to meet at the park, but Veronica felt safer at the stairs.

Defendant and Veronica hung out and drank beer at the stairs for a while.  At some point Veronica needed to use the restroom, and said she was going home, but defendant persuaded

2

her to go to the park and use the restroom there.  He said he had the keys to the restroom and showed her keys.

When Veronica went to the restroom, the entrance door was open and the lights were on.  She went into the stall, and while she was using the restroom defendant came in.  The stall did not have a lock on it and defendant was holding the door.  Veronica asked him why he was in the restroom and he said he was holding the door for her.  She said, "You're weird."  As she finished, defendant slammed the stall door open.  Veronica said, "What are you doing?" and walked past him to wash her hands in the sink.  Defendant told her that she had been "playing with him," and she said, "What are you talking about?"  She washed her hands and tried to walk out, but defendant "blocked the exit way."  At some point while her back was to defendant at the sink, he took his pants down.

Defendant told Veronica to take off her pants, and if she didn't do it, he would do it.  She asked him "why he was doing this," and defendant "just kept repeating that I have been playing with him."  At first, she thought she would "just let him do this to me and go home to my baby.  But when he was about to touch me, I just fought."

At the beginning of the encounter when she was at the sink and defendant told her to take down her pants, "[i]t was scary.  His eyes—he didn't have emotion."  Then, "he told me to turn around and bend over the sink."  When she took her pants down, "he had me then at the sink.  So he tried to—he was going to put his penis inside of me, but then I swung at him."

When Veronica swung at him, "that's when he grabbed my neck and everything."  He pushed her to the floor, and she "was crying and screaming and telling him to stop, please.  And he put his fingers inside of me.  And . . . he was behind me.  I kept fighting him from behind me.  I kept shoving at his face.  I left

3

him a scratch."  Veronica "[f]elt like I was getting stabbed" when defendant put his finger inside her vagina.

Defendant "was behind [Veronica], and I would break free a few times and try to run, but he would catch me and throw me back to the floor."  When he got her back on the floor, he put his fingers in her vagina again.  She broke free and tried to run "[p]robably like three times."  Veronica "would get to almost the door area, but he caught me each time."  Each time defendant got her on the floor, "he did it."  He penetrated her vagina again the third time he got her on the ground.

At one point after he had penetrated her vagina with his fingers, defendant pulled Veronica's shirt up, saying he wanted to see her pink nipples, "and then he pulled my arm up, and he started sucking on my boob."

Defendant had closed the entrance door, which was heavy.  The fourth time Veronica ran, she got to the door and held on to the handle.  Defendant told her "to suck his part at least instead."  She pretended she would do it so she could push him, but "he told me that he knew what I was doing."  Then, he started slapping her face.

Veronica would not let go of the door handle.  Defendant was trying to close the door with his body, but Veronica was able to put her bare foot "in between the door," and "got my foot bruised, but I didn't move my foot."  She thought defendant realized she was going to get away; he said, "If you leave, you will leave naked."  Defendant kept trying "to seal the door," but she was able to get her arm and foot through and push it open.  She "ran to the closest house with no pants or underwear, barefoot."  The ordeal lasted "[p]robably more than" 20 minutes.

Veronica "knocked like crazy" at the door, and asked the man who answered to call the police.  The man's wife came and

4

gave Veronica shorts, gave her water and called 9-1-1 for her, explaining that a girl had been raped.

## 2. The 9-1-1 Call and the Identification

Veronica told the 9-1-1 dispatcher that her attacker was called Cray and Lunitik; that he was a Hispanic man in his 20's, five feet four or five inches tall, wearing shorts, a gray and white shirt and a baseball hat with an "A" on it; and that he hung out at the park. She was scared because "he was still out there" and "[t]hey're going to want to get me."

Police officers, including Officer Isaias Medrano, came to the scene at about 3:45 a.m. Veronica was scared, crying and "really upset." An ambulance came and Veronica was put on a gurney in the ambulance. Then the police came with a suspect they had detained in the park. The ambulance doors were closed. Veronica looked through the ambulance windows and identified the suspect, from a distance of about 24 feet, as her assailant. (On the way to the hospital, Veronica told Officer Medrano that she and her assailant had met up at the park and were sitting in the bleachers when she told him she needed to use the restroom.)

According to Officer Medrano, who conducted the field identification, "[w]e got as close as we could"; Veronica "was crying, nervous," and kept saying she was afraid because of her attacker's gang affiliation; "[s]he was very afraid." She did not want to get any closer to him. Officer Medrano testified that "[o]nce we got close enough, that's when she positively ID'd the suspect." He wrote in his report that Veronica stated, "That's him. That's him. That's fucking him." (At trial, Veronica testified that she "didn't want to get close to him," and when the police described to her what he was wearing, "it was similar," so "I told them that's probably him.") At the hospital, Veronica told Officer Medrano that the assailant's moniker was Lunitik.

5

Two days later, Detective David Meza interviewed Veronica at Hollenbeck Station. He showed her a photograph of the person the police had in custody, and asked if that was the person who attacked her. She said, "No, it wasn't." Then he showed her a photograph of defendant, and she said, "That's him. That's Cray or [Lunitik]." Throughout the investigation, Veronica was terrified and would not tell Detective Meza where she was living.

The man Veronica mistakenly identified was Jaime Ramirez. He lived in her neighborhood, and she had seen him at the store near her house quite a few times, had spoken with him and knew his first name. Mr. Ramirez was 36 years old, five feet nine inches tall, and weighed 150 pounds. When defendant was booked, he was 21 years old, five feet six inches tall and weighed 140 pounds. Both men had facial hair at the time.

### 3. Subsequent Events and Proceedings

Veronica was taken to the hospital, where she was examined by Rosario Aguilar-Tanphanich, a Sexual Assault Response Team (SART) nurse. Veronica described the assault to her. The nurse found bruising to Veronica's arms, knees and hands, and when she felt Veronica's head, Veronica complained of tenderness to the back of her head. The nurse's vaginal exam found two abrasions (one of them a bleeding abrasion) and a bruise. These findings were documented with photographs. The injuries were consistent with sexual assault. Veronica said she had had no intercourse or penetration in the five days before the assault.

Ms. Aguilar-Tanphanich took a urine sample and DNA samples from Veronica's mouth, breasts, vagina, cervix, and other parts of her body. Defendant's DNA was present in the cheek face swab and shoulder swabs. Defendant was excluded as a contributor to the breast and perianal swabs; the DNA of an

unknown male was found in those swabs. Other swabs were inconclusive or too complex for a DNA analysis.

Jaime Ramirez's DNA was compared to all swabs that were suitable for testing and he was excluded from all of them.

The urine sample taken from Veronica was analyzed and only alcohol was found; no drugs were detected.

Defendant was arrested four days after the assault, on September 18, 2019. Detective Meza did not see any scratch marks on defendant's face.

Defendant was charged with sexual penetration by use of force (§ 289, subd. (a)(1)(A), counts 1 & 2); assault with intent to commit rape, sodomy, or oral copulation (§ 220, subd. (a)(1), count 3); and false imprisonment by violence (§ 236, count 4). The information also alleged three circumstances in aggravation: that the offenses involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)); the victim of the offenses was particularly vulnerable (rule 4.421(a)(3)); and defendant took advantage of a position of trust or confidence to commit the offenses (rule 4.421(a)(11)).

## 4.    The Trial

In addition to the facts already described, other evidence was presented at trial, including the following.

Defendant made telephone calls from jail that he knew were being recorded. He called his girlfriend Monique, "asking her to get some of [his] homies to go talk to Veronica," to tell Veronica to drop the charges. He said he would forgive her for accusing him if she did not press charges. Detective David Meza testified defendant told his girlfriend to reach out to "Steady" and "Chato" to go to Veronica's house and speak to her. On another

7

call, he told his girlfriend "to have some of his people, Sparky and Chato and his sister, go talk to [Veronica]."

Defendant testified on his own behalf. He stated he was a gang member with the gang name of Lunitik, and lived with his girlfriend at the time of the incident. He said Veronica was his "home girl" and they would "mess around" and "do certain things with each other." On the night of the incident, he met Veronica at the stairs at around 11:00 p.m., and they hung out for an hour and a half or two hours. He told Veronica he had found out he was having a baby with his girlfriend and "was ending our little relationship that we were having." He said they were talking, kissing and hugging, and he "reached down there" and "fingered her." Ninibeth Rodriguez and her brother Chato came after 15 or 20 minutes. Defendant left no later than 1:00 a.m. and went home. When he left, Ninibeth and Chato were still there. He did not have a key to the park restroom and never went to the park that night.

After he was arrested, defendant spoke with Detective Meza. He was cooperative and had no hesitation in agreeing to provide a DNA sample. He was "in shock" because of the charges. He described to Detective Meza what happened that evening; "I was very honest and very descriptive." However, he did not tell Detective Meza anything about breaking up with Veronica. (According to Detective Meza, defendant told him Veronica "was going crazy on him, upset with him," and that's when he left the stairs.) Defendant testified that "[t]oday is the first time" he was "mentioning anything about breaking up with Veronica."

Detective Meza testified that, when he interviewed defendant after his arrest, he asked defendant about whether Veronica scratched his face when she "went crazy on him." Defendant told Detective Meza that he did have a scratch on the

left side of his face. There was no scratch when Detective Meza interviewed defendant, but defendant told the detective that "it's healed now."

Ninibeth Rodriguez testified that her brother Julio (also known as Chato) and defendant were friends. She was with Chato on the night of the incident, and saw defendant and Veronica at the stairs around 11:00 p.m. She, Chato and Veronica were drinking beer; defendant was not. Veronica was also "doing another substance," smoking from a little pipe, and "she was intoxicated." Defendant left the stairs at 12:30 a.m. because he had to work in the morning. Ninibeth and Chato walked to the park, around 1:00 a.m. Veronica and another girl were at the park, too. They left the park at 1:30 a.m., and Ninibeth, who was driving, dropped Veronica off at her house. They stayed there for 10 or 15 minutes, and Ninibeth saw Veronica being picked up by some female.

Adrian Morales became the facility director of the park in 2022. He had no knowledge of the 2019 assault. He testified that Jaime Ramirez lived in his car in the parking lot of the park. Toward the end of 2022, he saw Mr. Ramirez opening a gate at the park, and Mr. Morales confiscated the key, which was a general key that would open outdoor restrooms and outdoor gates. Anyone could make a copy of the key, and Mr. Morales did not know how many copies there might be.

## 5. The Verdict

The jury found defendant guilty of all four counts. The jury found true the allegations that the victim was particularly vulnerable and that defendant took advantage of a position of trust and confidence to commit the offenses. The jury found not true the allegation that the offenses involved great bodily harm or acts disclosing a high degree of cruelty.

The court imposed a 14-year prison sentence, consisting of consecutive six-year middle terms on counts 1 and 2 (sexual penetration by force) and a consecutive low term of two years on count 3 (assault with intent to commit a felony).  The court imposed the middle term of two years on count 4 (false imprisonment by violence), to run concurrently with the principal term.  The court made various other orders not at issue on appeal.

Defendant filed a timely appeal.

## DISCUSSION

### 1.    The Claim of Instructional Error

Defendant contends the trial court erred in refusing to instruct the jury on third party culpability.  Defendant is mistaken.

#### a.    The legal principles

We review a claim of instructional error de novo.  The legal principles we apply are these.

"[I]t is well settled that ' " 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]  . . .  [S]uch [third party culpability] evidence is subject to exclusion under Evidence Code section 352." ' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 496 (*Hartsch*).)

" ' "[I]n appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case . . . .  [Citations.]  But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported

10

by substantial evidence [citation].' " (*Hartsch, supra,* 49 Cal.4th at p. 500.)

### b. This case

Here, the trial court did not exclude any third party culpability evidence. The question is whether there was any substantial evidence supporting the defense theory that someone else was the perpetrator.

Defense counsel proffered this instruction: "You have heard evidence that Jaime Ramirez committed the offenses with which the defendant is charged. . . . [¶] The defendant is not required to prove Jaime Ramirez's guilt. The defendant is not required to prove this fact beyond a reasonable doubt. In order to be entitled to a verdict of not guilty, the evidence establishing that Jaime Ramirez committed the charged offenses need only raise a reasonable doubt in your mind that the defendant is guilty."

In support of the instruction, defense counsel cited Veronica's initial field identification of Jaime Ramirez; Officer Medrano's testimony about how he conducted the field identification, and that on the way to the hospital, Veronica told him that she and her assailant had met up at the park and were sitting in the bleachers when she told him she needed to use the restroom; Veronica's testimony that defendant told her he had a key to the restroom; and Mr. Morales's testimony that (three years after the assault) he caught Mr. Ramirez with a key that opens all the restrooms.

The trial court refused the instruction, based on the established principle requiring direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

11

The court concluded that "what we have is . . . opportunity, but no direct link whatsoever."

The trial court's ruling was correct. *Hartsch* supports this conclusion. In *Hartsch,* the court held that two instructions – one of them similar to defendant's proposed instruction – "add little to the standard instruction on reasonable doubt." (*Hartsch, supra,* 49 Cal.4th at p. 504.) "[E]ven if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Ibid.*) *Hartsch* concluded the first instruction "simply restated the reasonable doubt standard in connection with the possibility that one or more others might be guilty parties."[1] (*Ibid.*) The court observed that "[t]he omission of this instruction, if error, could not have affected the verdict. It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes." (*Ibid.*)

---

[1] The first proposed instruction in *Hartsch* was: " 'If the evidence presented in this case convinces you beyond a reasonable doubt that the defendant is guilty, you should so find, even though you may believe that one or more other persons are also guilty. [¶] On the other hand, if you entertain a reasonable doubt of the defendant's guilt after an impartial consideration of the evidence presented in the case, including any evidence of the guilt of another person or persons, it is your duty to find the defendant not guilty.' " (*Hartsch, supra,* 49 Cal.4th at p. 504.)

As to the second proposed instruction in *Hartsch* – the one most similar to the instruction defendant proposed – *Hartsch* further concluded that it was "unduly argumentative."[2] (*Hartsch, supra,* 49 Cal.4th at p. 504.) This was so "because it *told* the jury that evidence 'indicat[ed] or tend[ed] to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offenses(s) charged.' It is improper for an instruction to indicate an opinion favorable to the defendant regarding the effect of the evidence." (*Ibid*.)

In short, there was no evidence directly linking Ramirez or anyone else to the crimes, and the trial court did not prevent the defense from arguing that someone else committed the offenses. There was no error.

**2.    The Claim of Prosecutorial Misconduct**

Defendant contends the prosecutor engaged in prejudicial misconduct by impermissibly vouching for the credibility of a witness (Veronica) during closing argument. Specifically, defendant objects to the prosecutor's statement that Veronica's "manner and behavior on the stand" was "consistent with

---

[2]    The second proposed instruction in *Hartsch* was: " 'Evidence has been presented during the course of this trial indicating or tending to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged. In this regard, it is not required that defendant prove this fact beyond a reasonable doubt. [¶] The weight and significance of such evidence are matters for your determination. If after consideration of all of the evidence presented, you have a reasonable doubt that the defendant committed the offense(s) charged, you must give the defendant the benefit of the doubt and find him not guilty.' " (*Hartsch, supra,* 49 Cal.4th at p. 504.)

13

somebody who's been sexually assaulted," describing her initial breakdown on the stand and her detachment about what happened to her as "all consistent behaviors and attitudes of someone who has been sexually assaulted."

Defendant did not object to the prosecutor's statement at trial, and argues alternatively that defense counsel's failure to object constituted ineffective assistance of counsel.

Defendant's failure to object at trial forfeits his claim of prosecutorial misconduct. (*People v. Redd* (2010) 48 Cal.4th 691, 746 ["[A] defendant must object and request an admonition in order to preserve a claim of prosecutorial misconduct."].) In any event, there was no misconduct. Because we find no misconduct and accordingly no reason for the defense to have objected at trial, defendant's alternative claim of ineffective assistance of counsel fails as well.

### a.    The legal principles

" 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480 (*Rodriguez*).) Stating facts not in evidence "is 'clearly' misconduct 'because such statements "tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination." ' " (*Ibid.*) " ' "Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal." ' [Citation.] We 'view the statements in the context of the argument as a whole.' " (*Ibid.*)

When a prosecutorial misconduct claim concerns a prosecutor's comments before the jury, " 'the question is whether

14

there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)

**b.     The prosecutor's comments**

The prosecutor's closing argument included the following remarks about Veronica's demeanor while testifying.  Defendant quotes only the first two paragraphs, but we quote the prosecutor's entire statement on the subject.

"Her [Veronica's] manner and behavior on the stand . . . I would submit that is consistent with somebody who's been sexually assaulted.  It was sincere, and it was appropriate in the sense that you saw her initially sort of break down when she saw the defendant here.  She doesn't want to hear the calls again.  She doesn't want to – doesn't want to be – she doesn't want to remember if she doesn't have to.

"She – you know, she's slightly detached about what happened to her.  You can see that from her demeanor.  These are all consistent behaviors and attitudes of someone who has been sexually assaulted.

"She didn't exaggerate or offer more.  She could have said he raped her.  She could have said he did all kinds of things to her.  From day one, she said – in her mind, she said rape.  Legally speaking, rape is defined a certain way.  And she might have thought he raped her because, as we all know, she wasn't exactly sure at any point when he was behind her if his penis went in her, but she was sure that his fingers did.  So that's why he is only being charged with digital penetration.

"I submit to you that she answered his questions without becoming combative.  Yeah, she was, at some point, maybe uncomfortable.  And if there was a question that she felt offensive, could she have been a little bit defensive?  Yes, but I think that's normal human nature when you are being cross-

15

examined.  But she answered questions to the best of her ability, and I don't recall her saying she never—she—I don't recall her not wanting to answer a question from the defense or avoiding a question or trying to skirt around a question.

"So her testimony makes sense.  And the physical evidence, in my opinion, corroborates her version of the events."

### c.      Contentions and conclusions

Defendant characterizes the prosecutor's comments as improper vouching because there "was no testimony about other sexual assault victims, how they acted," and "[t]he prosecutor's opinion that Veronica was sincere was not evidence."

We do not consider the prosecutor's brief comments as impermissible vouching.  " ' "[A] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 796.)  The scope of the prosecutor's latitude allows her to " ' "state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience." ' " (*People v. Williams* (1997) 16 Cal.4th 153, 221.) "Misconduct arises only if, in arguing the veracity of a witness, the prosecutor implies she has evidence about which the jury is unaware." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.)

This is not such a case.  The prosecutor's argument that Veronica's demeanor on the stand was consistent with someone who has been sexually assaulted did not imply that the prosecutor had evidence the jury did not have.  It is within common experience that one who has undergone a traumatic experience, sexual assault or otherwise, may break down when confronted with the assailant or exhibit detachment about what

16

happened.  Nothing in the prosecutor's comments " 'invite[d] the jury to abdicate its responsibility to independently evaluate for itself' " whether Veronica should be believed.  (*Rodriguez, supra,* 9 Cal.5th at pp. 480-481.)  There was no misconduct.

### 3.     The Claim of Error in Consecutive Sentencing

#### a.     The sentencing

As stated earlier, the court imposed a 14-year prison sentence.

It was undisputed that section 667.6 applies to the sex offenses of which defendant was convicted.  Subdivision (d) of section 667.6 requires consecutive sentences if the crimes involve the same victim on separate occasions.[3]  Subdivision (c) is a discretionary provision, allowing the court to impose a consecutive term "for each violation of an offense" if the crimes involve the same victim on the same occasion.[4]

---

[3]     Section 667.6, subdivision (d) provides:  "(1)  A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions.  [¶]  (2)  In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

[4]     Section 667.6, subdivision (c) provides in part that "a full, separate, and consecutive term may be imposed for each violation

By way of background, the defendant refused the prosecution's plea offer of eight years, countering with a proposal for nine years on kidnap and assault charges in order to avoid the consequence of sex offender registration. The defense's sentencing memorandum asked for the low term total sentence of eight years. Counsel identified factors in mitigation as a criminal record that was insignificant; defendant's "accept[ance of] responsibility before trial by offering to serve nine years" to avoid the consequences of a sexual assault conviction; and defendant's history of being a victim of abuse. A psychiatric evaluation identified defendant's prior treatment for psychosis and depression, a history of substance abuse, "some history of PTSD with molestation," and his removal from his home at a very young age.

The prosecution did not file a sentencing memorandum or propose a sentence at the hearing, deferring to the court. But the prosecution stated its position that there were two separate acts of penetration inflicted on the victim, as well as a third separate act where defendant tried to get Veronica to perform oral sex and was pulling her back and slapping her (count 3). (The court observed the evidence showed three acts of penetration but only two were charged.)

The trial court stated it found Veronica to be "very credible"; that "this was a very, very traumatic event in her life"; and "I'm sort of surprised that there's been no expression of sympathy or remorse or anything for how she feels and only the consequences that [defendant] will suffer." The court selected consecutive six-year middle terms on counts 1 and 2 (sexual

of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion."

18

penetration by force, § 289, subd. (a)(1)(A)), citing the two factors in aggravation found true by the jury.  The court stated that it could impose the high term, but chose the midterm in light of the minimal criminal history and that defendant "has had some abuse and mental health issues . . . and has been in the system himself."

The court found "there were three times that the victim got up and was taken back down to the ground, and then there was digital penetration. . . .  I find that [the two charges] are distinct because of the break and the victim getting up, making a run for the door, and then being taken back down to the ground."  The court found the two counts were within the mandatory section 667.6, subdivision (d) provision, and "[n]evertheless, if it was within [the discretionary subdivision (c) provision], I would exercise my discretion and impose full term consecutive sentencing as well."

The court found count 3 (assault with intent to commit a felony, § 220, subd. (a)(1)) was "for the act where she was on the sink and he was bending her over and attempting to penetrate her," and that was "a completely different type of conduct."  The court imposed a consecutive low term of two years.  On count 4 (false imprisonment by violence, § 236), the court imposed the middle term of two years to run concurrently with the principal term.

19

### b. Contentions and conclusions

Defendant contends the trial court erred in determining the offenses occurred on separate occasions because the evidence showed he lacked a reasonable opportunity to reflect between the crimes. We disagree.

"Once the trial court has found, under section 667.6, subdivision (d), that a defendant committed the sex crimes on separate occasions, we will reverse 'only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior.' " (*People v. King* (2010) 183 Cal.App.4th 1281, 1325 (*King*).)

"Under the broad standard established by Penal Code section 667.6, subdivision (d), the Courts of Appeal have not required a break of any specific duration or any change in physical location." (*People v. Jones* (2001) 25 Cal.4th 98, 104; see *People v. McPherson* (2001) 86 Cal.App.4th 527, 531 [citing precedent that "sexual assaults could occur on separate occasions even if there was no more than a change in the physical positions of attacker and victim"].)

Defendant relies on *People v. Pena* (1992) 7 Cal.App.4th 1294 (*Pena*), where the court found no "appreciable interval" between a rape and oral copulation, observing that after the rape, the defendant "simply flipped the victim over and orally copulated her." (*Id.* at p. 1316.) The *Pena* court stated the assault was "continuous" and the defendant "simply did not cease his sexually assaultive behavior, and, therefore, could not have 'resumed' sexually assaultive behavior." (*Ibid.*) *Pena* does not help defendant here, where defendant's successive assaults during a 20-minute period were interrupted by the victim's

20

repeatedly breaking free and defendant's "catch[ing] [her] and throw[ing] [her] back to the floor."

Defendant also relies on *People v. Collins* (1983) 143 Cal.App.3d 742, where the defendant pled guilty to one count of rape in concert with use of a knife and one count of oral copulation in concert, in exchange for dismissal of multiple other counts in connection with forcible sex offenses against the victim during a two- to three-hour period. (*Id.* at p. 744.) The court held the trial court's "imposition of a consecutive sentence for [the defendant's] conviction of oral copulation in concert was not mandated under section 667.6, subdivision (d). As heinous as [the defendant's] behavior was, there was an insufficient lapse of time between each of his specific acts to treat those acts as having occurred on separate occasions." (*Id.* at p. 746.)

*Collins* is not persuasive either. The court did not discuss the specific facts. In addition, *Collins* was decided before section 667.6, subdivision (d) was amended in 1986 to add direction on determining whether crimes were committed on separate occasions, including that " '[n]either the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions.' " (See *Pena, supra,* 7 Cal.App.4th at p. 1314, quoting § 667.6, subd. (d); Stats. 1986, ch. 1431, § 1; see also *People v. Corona* (1988) 206 Cal.App.3d 13, 17.)

As the trial court pointed out, there were three times where the victim got up, made a run for the door, and then was taken back down to the ground, after which there was digital penetration. Under these circumstances, we cannot say that " 'no

21

reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior.' " (*King, supra,* 183 Cal.App.4th at p. 1325.)

Having concluded section 667.6, subdivision (d) mandated imposition of consecutive sentences, we necessarily conclude the trial court acted well within its discretion in stating it would in any event exercise its discretion under section 667.6, subdivision (c) to impose consecutive sentences.

**4.      The Assembly Bill No. 124 Claim**

Sentencing occurred on September 11, 2023.  Defendant contends remand for resentencing is required because the trial court did not properly exercise its sentencing discretion under section 1170, subdivision (b)(6), which defendant refers to as Assembly Bill No. 124.

As relevant here, section 1170, subdivision (b)(6) provides that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  [¶]  (B)  The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 [under 26 years of age] at the time of the commission of the offense." (*Ibid*.)

The substance of section 1170, subdivision (b)(6) has been in effect since January 1, 2022.  (See *People v. Salazar* (2023) 15

22

Cal.5th 416, 423 & fn. 3.) Defendant was born on September 23, 1997 and the crimes occurred on September 14, 2019.

Defendant contends it is "unclear if the court considered the amendment to Penal Code section 1170." He says there was no finding that the aggravating factors found true by the jury outweighed mitigating factors or that low terms would be contrary to the interests of justice. He recites the details in his psychiatric evaluation, and cites *People v. Suazo* (2023) 95 Cal.App.5th 681, where the court stated that Assembly Bill No. 124 (§ 1170, subd. (b)(6)) was an ameliorative change that applied retroactively to the defendant. (*Suazo,* at p. 705.) In *Suazo*, the court stated that the defendant's statement in mitigation "suggests defendant may have a history of childhood trauma, including childhood abuse, thus potentially implicating Assembly Bill No. 124." (*Ibid*.) In *Suazo,* the prosecution "concede[d] the matter must be remanded for resentencing consistent with the changes made to section 1170, subdivision (b)," and the court accepted the concession. (*Ibid*.)

Here, when defendant was sentenced, section 1170, subdivision (b)(6) had been in effect for more than 18 months. The trial court described defendant's sentencing memorandum, and specifically stated the court had read and considered the psychiatric report, "indicating that at times [defendant] has suffered from some mental health issues, has some substance use and alcohol issues, has been in the system since he was a child, and has been victimized himself."

The court stated: "I think that this case is best as midterm given that two factors in aggravation were found true" (a particularly vulnerable victim and the defendant in a position of trust and confidence). The court further observed that it "could

23

impose the high term in this matter," but "look[ing] at the factors" cited by the defense in mitigation, the court thought "midterm is the best way to go."

We see nothing in the court's comments to indicate it was not aware of the presumptive lower term in cases where the defendant has experienced childhood abuse or is a youthful offender. The court began by stating the case was "best as midterm given that two factors in aggravation were found true," necessarily implying that the low term was inappropriate because of those aggravating factors. Indeed, the court further observed that it could impose the high term, but did not do so because of defendant's mental health and abuse issues. The court's comments make it clear that it weighed aggravating and mitigating factors and necessarily concluded—despite not using the statutory language—that "imposition of the lower term would be contrary to the interests of justice." (Cf. *People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322 ["Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant sentencing factors set forth in the rules."].)

## 5. The Section 654 Claim

The trial court sentenced defendant to a concurrent two-year term on count 4, false imprisonment by violence. We agree with defendant that imposition of the sentence violated the section 654 ban on multiple punishments for the same act.

### a. The law

Section 654 precludes "multiple punishments for a single act or indivisible course of conduct." (*People v. Miller* (1977)

18 Cal.3d 873, 885.)[5]  " 'The proscription against double punishment . . . is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute . . . .  The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' " (*Ibid.*; see also *People v. Latimer* (1993) 5 Cal.4th 1203, 1208 [same].)  "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

**b.    This case**

At sentencing, the trial court made no express findings about independent criminal objectives.  Defendant offered no argument on this point at sentencing, but both parties agree that

---

[5]    Section 654 states: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (*Id.*, subd. (a).)

25

the waiver doctrine does not apply to questions involving the applicability of section 654. (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

Defendant contends that "[s]topping Veronica from leaving the bathroom, false imprisonment, was done with the single intent and objective of committing the sex crimes against her." Among other precedents, defendant cites *People v. Martinez* (1980) 109 Cal.App.3d 851, where the defendant was charged with and convicted of assault with intent to commit rape and false imprisonment with force and violence. (*Id.* at p. 854.) The court held the two offenses charged "involved the same criminal event. The defendant assaulted his victim, dragged her under a bridge and, after he desisted from his attempted rape, held her for a few moments to attempt to convince her not to complain to the police. Under all of the cases applying section 654 of the Penal Code, only one sentence can be served for that sequence of events and the sentence on count II [false imprisonment] must be stayed." (*Id.* at p. 858.)

Similarly, in *People v. Wall* (1979) 95 Cal.App.3d 978 (*Wall*), the defendant was convicted of rape by force and violence and false imprisonment. (*Id.* at p. 981.) The court held that concurrent sentences violated section 654: "Assuming arguendo the facts found true by the jury, [the defendant's] 'intent and objective' was manifestly the crime of rape, and the false imprisonment was but a means of its accomplishment. Upon conviction of both of those crimes under such circumstances, an accused may be punished only for one." (*Wall,* at p. 990; see also *People v. Williams* (2017) 7 Cal.App.5th 644, 695 [the false imprisonment and robberies of victims who were forced into the back rooms of stores and forced to lie down "were an indivisible

26

course of conduct committed 'pursuant to a single intent and objective,' that is, to rob the victims of the cell phones, cash, and other merchandise in the back rooms of the stores"].)

Here, respondent describes the false imprisonment as defendant's "course of conduct in repeatedly preventing Veronica from leaving by violence or menace throughout the ordeal," but argues that "[n]evertheless, this did not preclude punishment" for the false imprisonment "for a number of reasons." These were that defendant had "an opportunity to reflect on his actions each time Veronica was able to break free, and because the gratuitous violence in restraining her had the separate objective of exercising control and domination over her, apart from the sexual assaults." We are not persuaded.

Respondent says that when defendant first blocked the exit and bent Veronica over the sink, Veronica testified "he was scary and his eyes were devoid of emotion." According to respondent, this is substantial evidence that defendant's intent was not only to restrict her movements so he could sexually assault her, "but also to frighten her into submission." Then respondent cites other things defendant said, such as that Veronica was "playing with him" and "must like being slapped and the only way she would leave was naked," as showing that defendant's objective "was to also humiliate her." Respondent concludes that defendant's objective of "dominating and exercising control over Veronica . . . was separate from [defendant's] sexual intent," and the "grabbing, pushing, slapping and injuring Veronica's foot" were "beyond what was necessary for the sexual assaults to be completed."

We fail to see how objectives to "humiliate" or "dominat[e]" or "exercis[e] control over" Veronica are in any way separable

27

from defendant's intent and objective in his sexual assaults on her.  Punishment for the false imprisonment requires an independent criminal objective, such as exists in cases where "gratuitous violence against a helpless and unresisting victim" has been viewed as "not 'incidental' to robbery for purposes of Penal Code section 654."  (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 190.)  Respondent does not address the *Martinez, Wall* or *Williams* case, and cites no authorities where sexual assault and false imprisonment were found to have been committed with independent criminal objectives.

We thus conclude there is no substantial evidence to support an implied finding that defendant harbored "multiple criminal objectives" that could justify separate punishment for the false imprisonment by force; as in *Wall*, defendant's intent and objective was "manifestly" the sexual assault crimes, "and the false imprisonment was but a means of [their] accomplishment."  (*Wall, supra,* 95 Cal.App.3d at p. 990.)  The sentence on the false imprisonment count must be stayed.

## DISPOSITION

The two-year concurrent sentence on count 4 (false imprisonment by violence) is stayed under section 654.  In all other respects, the judgment is affirmed.

GRIMES, Acting P. J.

WE CONCUR:

WILEY, J.        VIRAMONTES, J.

28